4. Elizabeth Sebesta v. Davis and others. Ms. Baumann. May it please the court. As this court is well aware, a motion for summary judgment is a contention that the meritorial facts are undisputed and the movement is entitled to judgment as a matter of law. This court has said that it is not an invitation to summarily resolve the case for against the movement, and only if this court can say in a sympathetic reading of the record that no finder fact could reasonably rule in the unsuccessful movement's favor. No, we're aware of that standard, believe me, and we're also aware of the fact that you didn't file a response, and so we take the facts as they were presented in the motion, although still, as the district court correctly said, reading them in the light most favorable to the non-movement. But can you tell me what disputed issues of fact you think are there, given the legal standards that govern intervention when there's a concern that a child might be in need of assistance from the state? Absolutely, and your honor is quite correct. We don't dispute, and the facts are deemed admitted. The court, yes. So the district court looks, I mean, none of this happens until the baby is born, which is September the 27th of 2010. And by that time, the earlier visit to first the Swedish Covenant facility and then to the University of Illinois Medical Center has already happened, and there's a lot of troubling information at the hands of the social workers, the DCSF people, the social worker at the hospital, Davis, and it seems to me they're doing what state law contemplates they should do. They have immunities under state law, and it's Yeah, the court did admittedly cite many factors, but as this court knows, the factors that can be considered and must be considered are only those known to the decision maker at the time the decision is made. So any facts... So what didn't count? I mean, maybe we should be specific. Let's talk about Davis. Davis visits Sebesta when she's at UIMC, and she visits her right after the baby's born, if I'm getting these facts correct from the district court's opinion. She visited her on one occasion after the baby was born. Right, and she sees that she's hostile, she's angry, she is arguing with her mother, and she reviews Sebesta's medical records. Well, that is incorrect. She and the Applebees actually did a careful job in their summary judgment materials. They never contended that Andrea Davis viewed all of the medical records. Andrea Davis testified exactly as to what she considered when she made the determination to report Elizabeth Sebesta. And she did, you see her wants, she did consider, she said that on that one occasion, Elizabeth was easily triggered, was hostile and angry, and had low insight into her psychiatric needs, demonstrated a lack of support, and argued with her mother. Right, and the state's, well, the brief that includes Davis, the brief filed on behalf of the Board of Trustees of the University of Illinois and Davis, also indicates that her assessment takes into account the recent psychiatric hospitalization, the potential exacerbation of conditions, you know, in the postpartum period. That's great. At docket 102, at paragraphs 25 and 27, 25 through 28 essentially, sets forth those things that she relied on, and the question is, was that, was that reasonable for- Is it a good faith report? Well, that's one question under ANCRA, whether there was a good faith report made. And to look at ANCRA, and see what it says in terms of what is considered neglect, what is a future risk of harm, and so forth. You know, what bothers me about your position, a lot of things bother me about the whole thing, but we have a line of cases that I'm sure you're very familiar with, culminating in the Supreme Court's decision in Descheny, which says, you know, even if a state home, you know, the equivalent in Wisconsin of DCSF knows that a child is being abused, there's no duty to take affirmative action, you wind up with the tragedy that happens in Descheny. So states pass laws like ANCRA, states are trying to say to the social workers, you are free to think, looking at this set of red flags, or this set of data, whatever you want to call it, that further investigation is called for, you're free to do that. We don't want to put a thumb in the scale of leaving children unprotected. And it seems to me that's a very rational state policy, and it's very hard for me to see why that violates anybody's substantive due process rights. In theory, you're absolutely correct, and we have to be concerned about the welfare of children, and it is, in fact, a compelling interest, when we look at the substantive due process argument, it's a compelling interest, but that doesn't... On the part of the state. On the part of the state, absolutely. Nothing is black and white. However, you are imposing significantly on the personal dignity, the familial relations between mother... See, that's where I worry about these facts, because you could, I mean, certainly if the child is taken from the family, nobody would dispute that's a very significant interference. That's not what happens here. Davis talks to her, the DCF people, Childs and Bean, conclude that she needs the in-home intervention, which Catholic Charities provides for some number of months before the indication is unfounded, and the child's never taken. That's true, but because there is this permissible statute, because it really is, it's significant that families... Let me put it this way. In Troxel, this court held that there is a presumption that parents will act in the best interest of their children, so that's where we have to start from, and yes, the state has an interest in saying we can protect, but it has to be done in the correct way, and people cannot abuse the privilege, which I believe Andrea Davis did. First of all, she did not follow the mandates of ANCRA. Mary Ann Fontana, if we just look at her testimony alone, and actually our expert concurred with what she said, what the standard under... Is your expert testimony part of the summary judgment record? It is. It's part of the record. That the defense submitted? Yes. Yes, everything was submitted, and Mary Ann Fontana said that the social worker must have a reasonable cause to believe that the child may be an abused or neglected child. Now, of course, we're not dealing with abuse here. We're dealing with neglect, and neglect in the rubric of possible future risk of harm is that there must be a likelihood of injury as the act of neglect or abuse. So what's the burden on somebody in Davis's position to make a final resolution based on all of the evidence that could be collected versus more of a probable cause kind of thing or a reasonable suspicion sort of thing, saying, I've seen enough. We need to look into it further. I'm not the final decision maker, but more needs to be done. Again, there's a balance there. She does not have to have proof of anything. She just has to have specific, articulable facts that she can point to that really get to the essence of what this person is charged with, which is a future risk of harm. Now, do you see this as a subjective test or an objective test? Would a reasonable person looking at these things go forward? Under ANCRA, it appears to be a subjective test, although I would disagree that that's appropriate, be that as it may, but under the constitutional framework, it's certainly an objective test. What would a reasonable DCFS worker or a reasonable social worker in the hospital context do? Is it correct that Davis was a mandatory reporter under state law? She is a mandatory, yes. And if she fails to report, even to promote further investigation, not taking the child immediately, but if she fails to act, she's exposed to criminal prosecution, right? If she does not act, if there's some willful failure, she may be subject to criminal prosecution. If she uses her discretion and something happens down the road, no, I don't believe she would be subject. And no prosecutor might ever make a mistake about her state of mind or if a tragedy were to occur and there were a public outcry for, to hold somebody accountable for a child's injuries or death, the prosecutor might never overreach, right? We know that, right. I know this is a very serious matter. You and Judge Wood have been talking in generalities for a while about the obvious tensions here, but this is also, it seems to me, a situation where the law has got to give somebody in Ms. Davis' situation an awful lot of latitude to err in either direction. We have to be very careful when we talk about what latitude we give people. Again, and the district court did not disagree that we're dealing with very important... What is the evidence of bad faith on the part of Davis that is in this summary judgment record? She did not follow the dictates of the statute of ANCRA. She didn't... Your last statement, she misjudged the future risk of neglect. I didn't say, I don't think she misjudged, yes. Please be as specific as you can be about the evidence of bad faith. The evidence of bad faith is that she did not consider any of the mitigating factors presented in this case, which the law requires. She did not consider, and in fact testified that she would disregard the opinion of the psychiatrist who saw Ms. Sebesta in the hospital and determined that she was no threat to the child. She acted in bad faith when she held certain things against Ms. Sebesta, which ANCRA prohibits. Specifically ANCRA prohibits that they may not consider the attitude or the hostility of the parent, and I'll find that in a moment. Toward DCFS. Yeah, I think that is towards Davis. Not toward everybody else. Yes, not toward Andrea Davis, but in terms of being and child. Yes. Neglected child is defined in Section 3, and I ask that you look at how neglect, how a reasonable social worker would understand and what it would understand neglect to mean. It looks like I'm running out of time already. Okay, why don't you sit down now, and I will certainly give you, if you need an extra minute for your rebuttal. Thank you. Good morning. Good morning. Mary Ellen Bush on behalf of the University of Illinois and Andrea Davis. I'm splitting my time with Mr. Siegel, who represents DCFS, so I have a timer here. Obviously, our first argument is that Appolin has forfeited any argument she can make to dispute our motion for summary judgment based on the fact that she has failed to respond at all, and that she has conceded, in fact, in her brief, that the statement of facts set forth by the defendants is true. Be that as it may. The facts are the facts, and you can still draw inferences in favor of one side or the other, and we have plenty of cases where somebody fails to file the proper 56.1 response, and the case isn't over at that point. No, I agree. I think that Judge Feinman noted and stated in our back, and as the Court has brought up, the exact basis and reasons why Andrea Davis made the referral that she did. It should be noted that because this is an obstetric case, the baby was probably only going to be in the hospital for a couple of days. She was kept for some medical reasons, but Andrea Davis doesn't have an opportunity to do a full investigation and resolution of her concerns. Can I just ask you, in terms of the substantive due process claim, I looked carefully at your brief and did not see that UIC ever asserted that it's an arm of the state. Isn't UIC a state institution? It is. Right, so why is there a 1983 action going on against UIC? I'm not 100% sure, Your Honor. Well, I'll tell you, there's a case called Will against Michigan State Police. It says the state is not a, quote, person for purposes of 1983. You've waived this, so it's not terribly important, but I'm surprised. I think that with regard to the federal claims, though, and the state action, is that the appellant has basically focused on the rights of the mother. I think that what we're looking at here is the rights of the child, and obviously the diet together, as Andrea Davis points out, but the reality is that the rights of the child were preeminent in Andrea Davis's mind, and the fact that she was going home with the mother under the circumstances that she was concerned about warranted the phone call. Why was she entitled, though, to disregard one of the things Ms. Baumann pointed out, to disregard the fact that the psychiatrists were saying that she wasn't a risk? I mean, these are highly trained people. The psychiatrist's evaluation was done after Andrea Davis's made the phone call to DCFS in chronological time, and the second thing is that the psychiatrists... But it wasn't limited to that minute. I mean, I'm sure it was a longer... Well, I think the basis for the psychiatric evaluation was to determine whether or not Ms. Besto could be committed involuntarily. That's why the terms are being used as to whether or not she was a harm to herself or others. The psychiatrist determined she was not a harm to herself or others or to her baby. That doesn't mean that she could not be potentially neglectful based on her psychiatric condition and the potential for exacerbation in the neonatal period, the vulnerability of the newborn, the fact that she actually didn't have a place to go initially when she was talking about the fact that she had no place to go. Her mother finally stepped in and said she could go home with her. But the bottom line is, did Andrea Davis act in good faith in making this referral? We believe that it is very, very clear that she did and that she is immune. I thought the facts were at least disputed about the availability of the home and that it was an appropriate home for the child. I mean, I understand your position. She might have thought, but was she rational in thinking that there was a problem when the mother is right there? The mother was right there, and they were having this intense argument the entire time that Andrea was in there with the mother and Ms. Sebesta. Subsequently, even when Mary Ann Fontana, who was Davis's supervisor, met with them, she said that the mother kept denying that her daughter had any psychiatric history when, in fact, she had a long psychiatric history, that she said it's just her temperament, but the records proved otherwise. So I think that the concern for the child was that the phone call was made. Whether or not DCFS intended to take up that call or do something with it is up to them. But the phone call itself was not that much of an invasion of the mother, the familial relationship, and certainly the anchor still does protect her. And just to be clear, Davis has no further involvement after the phone call is made. At that point, the baton is passed to DCFS. Yes. And I believe that's my point. Thank you. Thank you. Mr. Siegel. Good morning, and may it please the Court, Counsel. I'm Assistant Attorney General Evan Siegel on behalf of Gloria Bean and Alicia Childs of the Illinois Department of Children and Family Services. This Court should affirm the district court and conclude that my clients are entitled to summary judgment and at a minimum qualified immunity. Under either result, there are no disputed facts in this record because Sebesta has forfeited them, showing that either Childs or Bean acted unconstitutionally. Indeed, they were doing just what they were supposed to. They were doing their jobs correctly and lawfully. They acted under the well-established law in this circuit to protect the health and welfare of baby Elizabeth Sebesta. There was some discussion in the briefs about changes in the statute over the years and the extent to which I guess sort of the overall environment that the child was going to is a component of that. Maybe you could say something because I guess this was during a time that environment wasn't singled out as a factor. And I believe, Your Honor, you're talking about the decision to indicate Sebesta, which was made in November after the investigation occurred. This is not part of our brief, but my understanding is there were changes in the law that were made or ordered by the Illinois Supreme Court in 2013. Indeed, all of Sebesta's arguments on this point concern, as best I can follow it, the idea that in 2013 the Illinois courts ruled that as of 2012 after the events in this case, the defendants were supposed to have knowledge that as of 1980 the environment factors were not present. But first of all, all of those events happened post the critical period of time here, which is the fall of 2010. So from a qualified immunity standpoint, and these are all state law arguments that have nothing to do with federal constitutional rights, my clients did not have a reasonable basis to conclude that anything they were doing was patently wrong or incorrect. There must be a close fit, and of course between the cases that are deemed to provide new or different rights, and of course the actors must have knowledge of the change in law. None of that occurred here. So at the time of the indication, Beane and Childs had a great wealth of knowledge, having investigated in the hospital and having then afterwards accessed the medical and psychological records from the University of Illinois Hospital and from the hospital before Swedish covenant. Now we've had other cases in which, I'm not sure how realistic this is to be honest, but in which we've said, well, if you go to a parent and say, if you don't do X, then we're going to take your children away, that somehow isn't coercive. I mean it seems pretty coercive to me actually, but that's basically what she was told. If you don't agree to have these in-home services, then we may be forced to remove the child from your custody. Right, and what happened here was during the four-day window of the hospital stay, Childs, having spoken to her supervisor, made the offer to Sebesta to have these intact family services or to face the possibility of, not the absolute certainty, but the possibility of further action. That would require some formal proceeding. Absolutely. It would require the invocation of the state's attorney and a proceeding in juvenile court. That didn't happen. I want to emphasize that intact family services is a very unobtrusive offer of a range of options designed to protect the welfare of the child in the home. There is no removal of the child from the home, and so this basket of services is much less onerous than what this court held in Dupuy 2, one of the numerous Dupuy cases where the court held that it's better for parents to have a range of options under a safety plan than it is to have no options. Now, a safety plan can involve the removal of the child from the home. I'm sorry, it can require the removal of a parent from the home, one or other parent. It can require visitation. It can require oversight in the home by a licensed social worker, all kinds of moderate intrusions short of total removal. And then at the far end of the spectrum, there's separation. So in Dupuy, this court held that the offer and likened it to a negotiation in a settlement or to a plea agreement. The offer to take this less intrusive array of services weighed against the possibility of removal in no way, shape, or form is a constitutional violation. At what point in that process, you presented it in a benign way, but at what point in that process is a parent entitled to legal counsel if he or she can't afford it? Within intact services, Your Honor? In these negotiations. Well, you know, we'd like you to accept these intact family services, but if you don't, then we might have to consider more formal proceedings that could wind up temporarily or potentially even permanently separating you from your child. Well, I think the decision is up to the individual parents when to retain counsel. They don't have a right to. Ever? How about termination of parental rights cases? Are they entitled to the appointment of counsel? Yes. I do not know the answer to that question. This is a civil proceeding, so I don't know when a right to counsel would kick in. You don't think the state could permanently end a parent's right to a child without counsel for an indigent parent? You don't know off the top of your head, don't you? I do not. Okay. I do not. I know that in these proceedings. I believe the answer is no, but. Okay. As part of the basket of services, the array of services that are offered through intact family services, one of those is references to legal representatives, so financial assistance, help with substance abuse, and legal aid as well in that intact family services offering. Sebesta, Bean and Childs were doing their duty when they investigated Sebesta at both points, at both critical points, during the offer of intact family services and later at the indication. At the moment in the hospital in late September when that offer was made, Childs had three common threads to the decision. There was Sebesta's observed mental health. There was her unwillingness to acknowledge it or to treat it. And then there was the record, what at least three health professionals in two hospitals had recognized, including test results from psychological and toxicological examinations. All of this became known to my clients from September to November, and the more that they investigated, the more concrete became their knowledge that Sebesta was ill-equipped to care for a newborn child on her own. All right. If there are no further questions, we would ask that you affirm the district court judgment. Thank you, Mr. Siegel. And I said I'd give you two minutes, Ms. Baumann. Thank you. It's offensive that counsel gets up here and suggests that my client was ill-equipped to care for her child. There has never been any finding at any time that she was ill-equipped to care for her child. But that attitude kind of shows up the problem here. We have very real concerns about children being kept safe, but we also have very real concerns about governmental agency or agents abusing their power and using qualified immunity or good faith or what have you as an excuse. As this court recognized in Doe v. Heck, the unquestionable compelling state interest in protecting children of tender years from being abused may not be used as a pretext for arbitrary governmental intrusion into the private affairs of its citizens. And what I'm asking this court to do is look at the record and carefully determine what did Andrea Davis consider when she made her determination. She told me in her deposition, and they're in the statement of facts, what did Gloria Bean and the other defendant, Miss Childs, contemplate, consider. It's very specific. Their testimony is very specific, and it's not, as counsel just suggests, all kinds of psychological records and so forth. No. She did a checklist that showed, and it's part of the record, exactly what she considered. And I think the mental health aspect was that she was at moderate risk, something to that effect. And I see my time is up. If there are no further questions, I ask this court remand the matter to the district court. All right. Thank you very much. Thanks to all counsel. We'll take the case under advisement.